## Malis v. Lieberman

*Robert H. Malis,* for plaintiffs.

*Morris L. Rush,* and *Irving L. Mazer,* for defendant.

WEINROTT, J., March 31, 1971.—This matter is before the chancellor for adjudication after hearing on January 25, 1971. Procedurally, the history of this case is as follows.

The complaint, which was filed on September 15, 1967, sought to restrain Lieberman, individually, from selling shares of stock in defendant corporation ("2401") which had been issued to plaintiffs' decedent, a Philadelphia lawyer, and from causing any transfer of the said shares to be made upon the books of 2401. The complaint also sought the appointment of a conservator to receive the rentals and receipts of the apartment house which is owned by 2401, and is known as The Philadelphian.

Preliminary objections were filed by defendants attacking jurisdiction and service, and depositions were taken in support thereof. On November 26, 1968, this court overruled certain objections to questions propounded during the depositions, and after review of the depositions and the briefs filed, this court on January 8, 1970, dismissed the preliminary objections and the motions attacking service. Defendant Lieberman appealed to the Supreme Court of

Pennsylvania, and we filed a memorandum opinion on July 2, 1970. On July 2, 1970, the Supreme Court quashed the appeal, and subsequently an answer was filed to the complaint, which answer set forth extensive new matter, to which plaintiffs filed a reply. The hearing held on January 25, 1971, was in the nature of a preliminary hearing for the purpose of seeking relief from defendant Lieberman's continuing to operate and treat The Philadelphian as though it were his sole and exclusive possession, and for the purpose of obtaining financial information. Counsel for all parties stipulated before the court that the preliminary hearing on January 25, 1971, was to constitute the final hearing in this matter.

At the hearing, defendants moved to dismiss the proceedings on the theory that the rule for the injunction was returnable after the sale had already taken place on September 20, 1967; and further, upon the theory that even if the sale were to be held to have been defective because of technical defects or procedural impropriety, the question was moot because no sale held in accordance with any recognized procedure could have resulted in any equity for the estate of decedent. At the hearing, defendants' counsel requested and was granted permission to present testimony upon the motion to dismiss, it being the chancellor's opinion that further procedural delays might be avoided if testimony relevant to those two issues could be heard first.

Accordingly, at the hearing, defendants presented the testimony of four witnesses. At the conclusion of the hearing on January 25, 1971, plaintiffs' counsel requested and was granted time to determine whether, in light of the testimony presented on that day, he chose to present testimony on behalf of plaintiffs. Counsel for plaintiffs subsequently advised the court

on January 28, 1971, that it is not plaintiffs' intention to present additional testimony in this case. His letter dated January 28, 1971, with his permission, has been made part of the record in this case.

On February 21, 1971, defendant Lieberman died, and a suggestion of death was subsequently filed. Estelle Lieberman and Steven M. Jacobson, as Executors of the Estate of Jacob P. Lieberman, deceased, have been substituted for J. P. Lieberman.

Pursuant to Pennsylvania Rule of Civil Procedure 1517, as amended, effective September 1, 1969, the facts as admitted by the pleadings and as found from the testimony are herein set down in narrative form, and are these:

Jacob P. Lieberman, the original individual defendant, a citizen of the State of New York, was introduced to Max E. Cohen, plaintiffs' decedent, in the early part of 1959. Cohen was promoting the contemplated construction of an apartment house at 2401 Pennsylvania Avenue in Philadelphia, which later came to be known as "The Philadelphian." Lieberman was introduced as a financial backer to Cohen.

The parties entered into an agreement on May 26, 1959 (exhibit D-1) for the purpose of forming 2401 to acquire title to the land, and cause the construction of the building. Pursuant to that agreement, 2401 Pennsylvania Avenue Corporation was formed; and 1,000 shares of its stock were issued, 500 shares to Cohen and 500 shares to Lieberman. The corporation acquired title to the ground, and the construction of the apartment house was begun. Funds contemplated to be necessary to build the building were to be advanced by Lieberman, who was also to receive a salary during construction.

On April 27, 1961, a second agreement was entered into by the individual parties (exhibit D-2),

which agreement arranged for substantial additional sums to be provided by Lieberman or by sources to be obtained by Lieberman. The 1961 agreement contained an undertaking by Cohen and Lieberman to pledge their shares of the common stock of 2401 as security for the loans to be obtained by Lieberman. Lieberman did arrange for a loan of $1,000,000 from the Chase Manhattan Bank, but at the time of the FHA final closing of title, the amount of this loan had been reduced to $680,000.

Under the provisions of the agreements, it would appear that Cohen was responsible to pay to Lieberman, prior to the time of the FHA final closing, one-half of Lieberman's total advancements. Demands were made by Lieberman upon Cohen for repayment of moneys in anticipation of the FHA final closing which took place on March 31, 1965, but no moneys were paid by Cohen. In fact, Cohen took his own life on March 31, 1965, 26 days before the final closing. A detailed summary of the transactions at the closing are set forth in exhibit D-4, which is a letter to Lieberman from the lawyer who represented him at the closing.

On May 20, 1965, Lieberman paid the Chase Manhattan Bank the $680,000 due it, and he claimed from Chase the total 1,000 shares of stock of 2401 pledged with Chase. By stipulation in this case, the 500 of those shares which had been issued to Cohen were obtained from Chase, and have been held in escrow pending the outcome of this litigation.

Lieberman waited two years after the final FHA closing to schedule a sale of Cohen's stock. His lawyers advised him that the 1961 agreement might be interpreted to require that waiting period. He scheduled a sale of the stock to be held on September 20, 1967, unless Cohen's personal representatives paid to him, prior to the date of the sale, one-half of the

amount alleged to be due Lieberman from 2401. Notice was sent to the executors by letter dated May 29, 1967 (exhibit D-7) in which the total indebtedness alleged to be due Lieberman from 2401 was stated to be $4,313,104.24.

Although Cohen's executors asked for more detailed information by letter dated June 5, 1967 (exhibit D-8), the executors were not satisfied with the information they received in the letter dated June 22, 1967 (exhibit D-9). There was little evidence at the hearing that any additional information was given to the executors.

A sale of the 1,000 shares was advertised in the American Banker, and the sale actually did take place as advertised. The stock was sold on the steps of the Chase Manhattan Bank at 185 Montague Street, Brooklyn, N. Y., and was conducted by a New York marshal, the New York equivalent of a Pennsylvania sheriff. The marshal's affidavit indicates that all of the shares were sold to Lieberman for the sum of $100, and it is clear that there were no bidders at the sale other than Lieberman.

Although the complaint in equity had been filed prior to the sale, it was not served before the sale had actually taken place.

From the time of the sale until the time of his death, Lieberman continued to operate The Philadelphian, and to conduct the business of 2401 without reference to the executors of the Cohen estate. Plaintiffs have had no access to the operating records, nor have they been treated as stockholders. So far as the record indicates, Lieberman had conducted the business as though he were the sole stockholder of 2401.

The testimony of Theodore M. Metzendorf is that the books and records of 2401 indicate an indebtedness

at the time of the sale due Lieberman from 2401 in the amount of $4,384,299, a figure somewhat higher than that set forth in the demand letter. Lieberman claimed that the amount reflected on the books was less than the amount due him, because various advancements, such as prorated expenses, had not been entered upon the books. Lieberman's actual demand was for the approximate amount of $5,000,000. Richard Malis, one of the executors, has stated that he believes that the $4,384,299 amount contains some overcharges, inflated expenses, and improper interest, but it is the chancellor's opinion that these items of alleged overstatement are minimal in nature. The chancellor has concluded that the credible evidence of indebtedness is in the amount of $4,384,299.

The total project cost of The Philadelphian apartment house was $17,191,445, and the mortgage balance on April 30, 1967, was $15,657,700. On the same date, the operational deficit of the building was $2,308,965.36.

The parties invested $12,500 each for capital stock, and Cohen received back $25,000 which was charged to architectural fees. It would appear that Cohen had no investment in 2401 on April 30, 1967.

The total indebtedness of the corporation on April 30, 1967, including the mortgage debt, the debt to Lieberman, and all other debts, was $21,313,140.18, but current assets reduced the deficit to $20,674,229. Thus, the land and building on April 30, 1967, constituted the fixed assets of 2401, and the net indebtedness against those fixed assets was $20,674,229. The evidence indicates that at the time of the sale on September 20, 1967, the indebtedness was even greater because the building was operating at a deficit.

The question which is raised by the relatively undisputed facts recited above is not whether the sale of Cohen's stock was legally sufficient, but whether it matters if the manner of sale leaves something to be desired. The sale was held pursuant to paragraph 7 of the 1961 agreement. Though this agreement and the preceding agreement of 1959 both appear to have been drawn by experienced counsel, the fact is that paragraph 7 says little with regard to the procedure of sale, and the agreement generally makes no other reference to the nature or manner of relief in the event of default. Paragraph 7, in its entirety, reads as follows:

"7. In the event that:

"(a) Except as hereinafter modified, all funds and monies due to any bank, contractor or subcontractor, or materialman, or any individual, including LIEBERMAN, but excepting monies due LIEBERMAN as of April 1, 1961, shall not have been duly paid at the time of final Federal Housing Administration closing, if the improvement is begun; or

"(b) All of the funds due LIEBERMAN, including those covered by debentures secured by Mortgage, as provided in the Agreement of May 26, 1959, in the principal or face sum thereof, shall not have been fully repaid within Two (2) years after such final Federal Housing Administration closing.

"Then and in either case, LIEBERMAN shall have the right:

"(a) To cause the stock so held in escrow to be exposed at public or private sale. At such sale, COHEN or LIEBERMAN may become the purchaser, freed and discharged of the interest or equity of the other.

"(b) To cause such stock to be voted for the sale of the land and building and other physical assets

of CORPORATION, at public or private sale, at which sale either party may become the purchaser, freed and discharged of any interest or equity of the other."

The chancellor is being asked to determine whether the sale which, in fact, took place meets the legal requirements of the agreement. No testimony was presented at the hearing to explain the meaning of the somewhat abbreviated language of paragraph 7. This is no doubt due to the fact that Cohen was deceased at the time of the hearing, and the rules of evidence, therefore, restrained defendants.

Although plaintiffs have argued that the sale, as held, was improper because it was not advertised in a newspaper of general circulation in the City of Philadelphia, the chancellor has concluded from all of the testimony that it is unnecessary to determine whether or not the sale was, in fact, commercially reasonable under the circumstances. The testimony of defendants' witnesses is helpful to resolve the issue before the court. The chancellor has noted carefully the testimony of the witnesses and finds defendants' testimony to be most credible.

Mr. Jacobson impressed the chancellor as an extremely competent lawyer. Much of the history of the transaction was elicited from his testimony.

The chancellor has concluded from the testimony of Mr. Metzendorf that the books of the corporation should be accepted as true and correct. Therefore, for the purposes of this suit, the indebtedness due from 2401 to Lieberman must be accepted as being correct in the amount of $4,384,299. That conclusion, as previously stated in this opinion, is dictated by the fact that Mr. Metzendorf's professional, uncontroverted testimony is that the books and records were kept in the regular course of business, were

kept consistently throughout the period involved, and by the fact that the increase in indebtedness was calculated in accordance with prior calculations of indebtedness due Lieberman (approved by Max Cohen) in connection with the 1964 audit.

Louis Silverman testified for defendants to establish the market value of The Philadelphian at the time of the public sale. He is a lawyer and appraiser, and is well known to the court and all counsel as a qualified appraiser. He described The Philadelphian in some detail. He indicated that the market data approach to value was useful to him only in establishing the value of the land; that the reproduction cost approach was not directly relevant to an investor's decision, and that for the foregoing reasons he based his appraisal essentially on the income approach method; first, without regard to any mortgage, and, secondly, on the basis of the assumption of the existing mortgage. He concluded that although the mortgage was in excess of $15,000,000, and the building cost was close to $19,000,000, the fair market value of the building and land on September 20, 1967 was $10,000,000. He concluded that it would cost $18,900,000 to replace the building at that time, but that it would not be worth it. Thus, Mr. Silverman's testimony is to the effect that on September 20, 1967, there would have been no bidders at any sale of The Philadelphian, if the building were sold subject to the existing mortgage, or if all the capital stock were sold as an alternative method of acquiring the building subject to at least the debt of the first mortgage lien.

Mr. Silverman's professional ability and reputation compels the conclusion that he testified honestly and in good faith. However, Mr. Silverman's testimony as to the value of The Philadelphian at the time of the sale of the capital stock on September 20, 1967, is

colored, in the opinion of the chancellor, by his years of appraisal for the purpose of condemnation proceedings. It may very well be that Mr. Silverman's conclusion that the building's value did not exceed $10,000,000, $10,500,000 or $11,000,000 is a fair conclusion based upon the premise that its evaluation must be in accordance with appraisal standards and techniques which tend to disregard available financing. On the other hand, the chancellor does not live in a vacuum, and he is aware of the fact that our land is well populated with real estate speculators who will purchase buildings such as The Philadelphian on a speculative basis, without regard to basic appraisal techniques, where it appears to the speculator that a relatively small cash investment can produce leverage which may, indeed, develop a return upon investment though the total cost of the project may appear to be excessive, on a positive basis, when the full principal amount of the mortgage is included. Thus, without disregarding Mr. Silverman's testimony that the value of The Philadelphian as a real estate investment did not exceed $10,000,000, the chancellor is impressed by, and accepts, Mr. Punia's testimony that notwithstanding the amount of the mortgage of approximately $15,657,000, he would pay $250,000 to $300,000 in cash for the position of ownership, if he were to utilize the tax loss, or for other speculative purposes.

Charles Punia obviously has no interest in the outcome of this case. The court was impressed with his testimony. He has been engaged in the apartment investment business since 1923 and in thousands of real estate transactions. His company now operates over six thousand apartments. He inspected The Philadelphian and looked at representative floor

plans. Based upon the operating figures for the year ended April 30, 1967, and the mortgage requirements for calendar year 1968, he indicated that he would have bid only if in the not too distant future the job could break even and he could use the depreciation in the meantime.

Although Mr. Punia insisted that he would not have purchased the capital stock of the corporation instead of the fee title, the chancellor is of the opinion that a buyer other than Mr. Punia might very well have purchased the capital stock if he could have satisfied himself with some certainty of the amount of indebtedness assumed.

In Mr. Malis' letter of January 28, 1971, he states that his independent investigation forced him to the conclusion that the market value as of September 30, 1967, of The Philadelphian was "somewhere between the amount of the existing first mortgage and $700,000 in excess thereof." Mr. Punia's testimony, therefore, is not inconsistent with plaintiffs' final position. It is unnecessary to conclude what price a purchaser might have been willing to pay so long as we conclude, as we have, that the price would not have exceeded even $1,000,000 above the mortgage debt.

In view of the fact that we have accepted the amount of indebtedness as $4,384,299, plaintiffs can establish no case unless they are capable of persuading the chancellor that the probable purchase price could have been in excess of the amount of that debt. On the contrary, by plaintiffs' own admission, the probable purchase price would have been less than 20 percent of the amount of the debt then due Mr. Lieberman; and the credible testimony of Mr. Punia would establish the maximum price at less than 10

percent of that debt. Mr. Silverman would have us conclude that there would be no bidders whatsoever willing to pay any price over and above the mortgage.

After careful consideration of the issues involved, the chancellor has concluded that no sale of all of the capital stock of 2401 or of the fee title to The Philadelphian, held under any circumstances whatsoever, on or about September 20, 1967, no matter how well advertised in publications of general circulation, and no matter how well publicized, and no matter how well known to substantially all prospective buyers of such a building, could have brought a price over the mortgage debt which would have been larger than the amount of the debt due Mr. Lieberman so as to create any equity for distribution to the stockholders, including the estate of Max E. Cohen, deceased. Under the circumstances, the chancellor considers moot the questions whether the sale was commercially reasonable, or adequately advertised, or whether an alternate method of selling might have, in fact, been more desirable or more productive.

The chancellor believes that Mr. Lieberman might have advertised the proposed sale more widely in order to make it less subject to the criticism that it was not held in a commercially reasonable manner, but the chancellor, in view of the circumstances surrounding the continued defaults of Max Cohen existing at that time, and the unending requirements for loans from Lieberman, can understand that Lieberman considered the entire process of sale as a routine procedure intended to satisfy the processes of the law rather than to serve any commercial function.

Although, in his letter of January 28, 1971, Mr. Malis contemplates the possibility that the court will find in favor of plaintiffs but also concludes that the

estate of Max E. Cohen suffered no loss or damage, it is the court's conclusion that the credible testimony presented to the chancellor does not establish improper conduct on the part of defendants. The court concludes that defendant Lieberman was a creditor of 2401 in at least the amount of $4,384,299 on September 20, 1967; that the size of such debt was not contemplated by the parties to the agreements D-1 and D-2; that Mr. Lieberman properly availed himself of the remedies provided for in the said agreements; and that Mr. Lieberman became the owner of all 1,000 shares of the capital stock of 2401 at the sale held on September 20, 1967.

The chancellor notes that a major question giving rise to this litigation was created by the lack of detail and specificity set forth in the agreements in connection with the exercise of remedies upon default; and also notes that had Mr. Lieberman and his representatives dealt with the duly-appointed fiduciaries of Mr. Cohen's estate in a more candid fashion, and had they disclosed The Philadelphian's financial status to the extent requested, this entire protracted litigation might have been avoided.

And now, March 31, 1971, the above matter having come before the court as on final hearing, it is hereby ordered and decreed that the complaint be and hereby is dismissed with prejudice in favor of defendants and against plaintiffs, and the present escrow holder of 1,000 shares of the common stock of 2401 Pennsylvania Avenue Corporation be and hereby is directed to deliver the same to Estelle Lieberman and Steven M. Jacobson, Executors of the Estate of Jacob P. Lieberman, deceased, as the property of the said J. P. Lieberman.

The parties are directed to bear their own costs.